The next case before us this morning is 23-2052 Encinitas v. New Mexico Corrections Department. And we're ready when you are, counsel. Good morning, Your Honors. I'm Parrish Collins, counsel for Trini Encinias, the mother of Adonis Encinias. Adonis Encinias was a 23-year-old inmate. I'm having trouble hearing you. Can you raise the podium or speak louder, please? Sure. Is that better? It's better. Okay. I represent Trini Encinias, the mother of Adonis Encinias. Mr. Encinias was an inmate in the custody of New Mexico Corrections Department from February 21, 2018 until December 2, 2018, at the time of his death by suicide. Mr. Encinias had a long history of severe mental health issues preceding prison. He tried to commit suicide three times prior to prison. Once entering into the Department of Corrections on February 21, 2018, he attempted to take his life three more times while in the custody of New Mexico Corrections. Upon entering the Department of Corrections on February 21, 2018, he was diagnosed with PTSD, schizophrenia. One month later, in March 2018, PTSD, schizophrenia, intermittent explosive disorder, and persistent depressive disorder. This continued all the way to the last couple of weeks of his life. On November 18, 2018, he was classified as Clearance Level 5 or Code 5, meaning he needed the highest level of care. He was put on suicide watch. No care was provided. He was taken off- So let me, he was put on suicide watch. Right. I mean, is that a type of care? That's not care. That's segregation, a minimum of 23 hours a day in your cell. There was no actual medical care provided. On November 21, 2018, he was taken off suicide watch at the 72-hour mark, which would have mandated a psychiatric evaluation. He was sent to another unit where he was again placed in segregation, a minimum of 23 hours a day in his cell. No services were provided. He was seen on November 27th for the last time by Defendant Woodbury. She noted no concerns. However, she didn't do an evaluation. She filled out the mandatory forms for removing someone from suicide watch by entering strictly biographical information, name, birth date, Social Security, and so forth. The rest of the form was left blank. There was no evaluation. He was simply moved to another unit, kept in segregation, no services. So this is not a case of a failure to diagnose. He was diagnosed many times throughout his entire stay with the Department of Corrections. This is a case where nothing was done following that diagnosis. I want to go to three of the defendants, Dominguez, Maurer, and Woodbury. It's a little unclear to me. It's ambiguous, I guess, in the record. Did you charge them with failure to be gatekeepers, or did you charge them with failure to do their therapy jobs responsibly? Well, the district court, and I think rightfully so, found that Mr. Insinius made a facial showing of deliberate indifference and failure to provide care. Care, that's what I gathered. Right. Vidal was charged with not being a good gatekeeper. He didn't call other people that he needed. Exactly. There's a variety of duties that prison employees might have. Gatekeeper is one. Doing their own actual jobs are one. So it was clear that Vidal was charged with not being a good gatekeeper, among other things. But it was very ambiguous whether Dominguez, Maurer, and Woodbury were charged with not being a proper gatekeeper, as well as not doing their other therapy work properly, or just charged with not doing their other therapy work properly. Which was it as to those three? Well, according to the district court... Nothing. I want to know what your allegations were. Did you allege, and where did you allege, that Dominguez, Maurer, and Woodbury were not good gatekeepers, as opposed to simply saying they didn't do their other therapy properly? Well, by definition, they're gatekeepers. No, you've got to allege that they failed to meet certain responsibilities. And I want to know where you said they failed to meet their gatekeeper responsibilities. I know you said they didn't do some of their other work properly. But where do you allege? Just give me a site in your complaint where you allege that they didn't properly function as gatekeepers. Okay. Well, as you noted, Vidal did not meet as gatekeeper. It's not. It's not alleged. It is alleged. Where? He didn't refer him up to a higher level of care. He didn't refer him to a doctor. Are you talking about Vidal? Pardon me? Who are you talking about? Vidal. Yeah, I'm not asking about Vidal. You clearly made that allegation as to him. I'm asking about Dominguez, Maurer, and Woodbury. What are they being charged with having done wrong? Well, they all noted, well, Dominguez and Maurer noted that he was hopeless. You know, he was exhibiting hopelessness. Yeah, they may be. What did they do that was legally wrong? What do you allege in the complaint that they did that was wrong? You allege that they didn't do their job, their therapy jobs properly. That's clearly alleged. That's what they did wrong. But I did not see an allegation that they also didn't function as a gatekeeper and bring other people in as part of their default. Is that correct or wrong? If I'm wrong, tell me where you do allege that they didn't follow their gatekeeper responsibilities. Well, I don't believe any of the precedents says that you have to find both a treatment, a violation of the treatment duty and the gatekeeper duty. Maurer, Dominguez, you know, filled in their gatekeeper duty and their treatment duty. But Ms. Woodbury filled in her treatment duty. All of them filled in their treatment duty. None of them provided care whatsoever, despite ongoing suicidal threats, despite clearance by medicalization. The duties of Dominguez, Maurer, and Woodbury were to provide certain kinds of therapy. So if we're needing to find clearly established law, we're then going to have to find, and I don't see that I did find clearly established law about what those kind of therapists had to provide. Well, there are. Suicide is treated as a failure to provide medical care. That dates back to Estelle, 1976. Farmer, 1994. You know, and the Tenth Circuit, you know, all the precedent in the Tenth and the United States Supreme Court say that doing nothing in the face of a serious medical condition is a violation of the Eighth Amendment. And as such, the defendants would not be entitled to qualifying immunity, and it's a prima facie showing of deliberate indifference. That goes back to 1994, at a minimum. Does it matter at all in terms of the clearly established law that with respect to Dominguez and Maurer, at least, over three months passed from the time they last saw the decedent and when he committed suicide at a different facility? How do those facts affect what the standard was here? Well, I'm not sure that the mind, you know, maybe I'm not recollecting the facts correctly, but I believe Dominguez and Maurer were both at the facility where Mr. Insigne has committed suicide, which is the Central New Mexico Correctional Facility. The three months, they didn't see him, but they were certainly involved in weekly meetings. They reviewed his files. They knew exactly what was going on. None of them took action. There was never any services provided. They simply continued to diagnose him and put him on suicide watch. That is not treatment. In fact, it's less than treatment. It's segregation, minimum of 23 hours in your cell alone. That's, if anything, destructive, not productive. That is not care. We have case law that if someone is suicidal while incarcerated, that they have to do something. But I don't know, as I think Judge Ebel has already alluded to, that we have any case law, either from the Tenth Circuit or the Supreme Court, that says you must put them in weekly therapy, or you must reevaluate their prescription drugs, or it tells precisely what it is you're supposed to do. And don't we need some of that in order for this to be clearly established? Well, I do think it is clearly established that doing nothing is a deliberate indifference. Well, in the cases about doing nothing, I think you'll find that putting someone on suicide watch is not considered doing nothing. Now, it's not treatment, but it's not doing nothing either. If you leave him in a cell where he's got access to things by which he can injure himself and nobody's watching, that's treated differently than if they put him into a place where he can be observed and they can try to prevent him from committing suicide. So I'm trying to get behind what doing nothing means in terms of our clearly established case law, either from this court or the Supreme Court. Okay. Well, building on what you just said, Your Honor, if we look at the last five days, he was last seen by Defendant Woodbury on November 27th. He died on December 2nd. During that time, he was placed in segregation in another unit. The records don't suggest that he was monitored. There were no services provided. And suicide watch in the Department of Corrections, and this is in the complaint, is, in my estimation, callous and cruel, especially for a severely mentally ill inmate who's tried to kill himself three times within the Department of Corrections and has ongoing threats that he's going to kill himself. He has a plan. He has a means. And then they put him in the last five days without ever checking on him, according to the records, and left him in his cell a minimum of 23 hours a day to deal with his torment on his own. On December 2nd, he succumbed to that torment and took his own life. If there are no further questions, I'd like to reserve my time. That would be fine. Thank you. Thank you. Thank you. Good morning. My name is Mary Torres, and I represent the Department of Corrections and the four individual mental health treatment providers that were sued by the plaintiff. We ask that this court find that there was no qualified immunity. We ask this court find that there is qualified immunity. And that qualified immunity precludes plaintiff's claims. As this court knows, there are two prongs to the qualified immunity analysis. There's a constitutional prong and there's the clearly established law prong. This court is focused on the clearly established law prong. And what's important about that is the eminence requirement that the individual defendants actually inferred that Mr. Insinius was an imminent suicide risk. And this court has recognized in its clearly established law the eminence requirement in the Warner case and in Crane. The U.S. Supreme Court has recognized that eminence requirement in the Heller case. The Seventh Circuit, Sixth Circuit, and Ninth Circuit, we've cited in our briefs, recommend and follow that eminence requirement for suicide cases. Okay? And that's really important because suicide cases and mental health cases are so different than medical treatment cases like we've seen in the Mata v. Seitz case or Seelock. You know, you can see a severed finger. You can see a broken arm. You can see someone having, like, symptoms of a heart attack. Right? That's obviously observable to you. And then you can have diagnostic tests that can confirm your diagnosis. Right? But when you've got a mental health condition, you can't ‑‑ there's not really diagnostic tests for that. You'll have to ‑‑ Sorry. Sorry. Didn't this person attempt to commit suicide on numerous occasions? Certainly. And he had ‑‑ Isn't that seeing something? Well, that's not seeing something at that actual moment. And, in fact, the case law provides that past suicide attempts does not mean that a person is going to commit suicide in the future, which is why you have to have this eminence requirement. What the records reflect and what the allegations are in the complaint is that Mr. The records show that he was seen over 30 different times for mental health treatment, had treatment plans, et cetera. He was put on suicide watch twice. And suicide watch, according to the state of NOVAC that we cited in our Seventh Circuit case, it is to prevent an attempt from succeeding. And that's exactly what occurred. That's what suicide or therapeutic watch is. And this court has held and courts have held that when faced with a suicide risk with inmates, you can do certain things. You can put them on therapeutic watch. You can put them in a suicide vest. You can take away things in their cells to make sure that they're not using those as any instruments. And what we have ‑‑ But I think the argument here is that suicide watch, yes, it's a way to prevent them from actually killing themselves. But you have identified a real mental health issue. Correct. And we've got them putting him in Code 5 and saying that he was hallucinating and having indicating he had suicide ideation. And yet there was no attempt other than segregating him. There was no attempt to actually treat the medical condition. Okay. Which, I mean, the record seems to support that. Well, there is no clearly established law that says ‑‑ I'm focused on prong one right now. Sure. Because maybe it's time to clearly establish some law. Because we see these cases over and over and over again. I totally agree. I totally agree. Because there is no clearly established law. And there needs to be clearly established law that says you've got to have an imminence requirement. And then you have to spell out what these mental health providers are supposed to do. You know, the imminence thing, I must say that I'm not very persuaded by your argument on imminence. Because he said over and over that he was thinking of killing himself. He had a plan. He had a means. And once you have that, you don't ‑‑ I mean, I think the prison has to assume he continues to have that ideation until he's gotten counseling and renounced it. But he didn't. And so, I mean, I would say imminence was once somebody says, seriously, I've got a suicidal effort here in mind and I've tried it and I'm depressed and I'm still depressed and nobody's treated my depression, I think it's not unreasonable to assume that that is an existing imminent risk until it's somehow treated and taken care of, which it wasn't. Well, then, we've got an allegation in the complaint that on November 18th, when Tito Vidal saw him, he told Tito Vidal, I'm no longer a suicide risk. I'm not going to commit suicide anymore. He told Tito Vidal that. The allegation in the complaint, though, is that at that time, is that a woman, she, I think ‑‑ Tito, Mr. Vidal. Oh, sorry. Mr. Vidal did not do an evaluation. Didn't do an evaluation, just, you know, I mean, not to put too much rational thought into it, but if somebody is absolutely committed to kill themselves, they might be exactly what they say so that they cannot be interfered with while they do it. Well, Mr. Vidal, the complaint alleges that Mr. Vidal knows what is in his file, knows what kind of medical treatment he has received. So Mr. Vidal would have known that he had been under therapy, that he's been seeing psychiatrists, et cetera. Mr. Vidal would have also known that he had been placed on suicide watch two other times before and had not been successful in his suicide, and he's having to believe this inmate. Now, what is ‑‑ Well, wait a minute. My notes indicate it was Ms. Woodbury who was the last one to see him. Sure. And that it was to Ms. Woodbury that he indicated that he had no mental health concerns. Just to ‑‑ yes. I think that ‑‑ And was she the one that removed him from suicide watch? No, sir. Who was that? No, sir. Which one was that? That person is not a named defendant. Okay. All right. Okay. So Mr. Vidal saw him two times, placed him on suicide watch because he said he was going to harm himself. Then the next day when he sees him again, he says, I'm no longer going to be ‑‑ I'm no longer a danger to himself. But he would not promise to Mr. Vidal that he wasn't going to hurt himself. So Mr. Vidal exercised his professional judgment as a mental health treatment provider and kept him in suicide watch. But he kept pleading for help, for counseling. He kept pleading it over and over and over again for counseling. He received that counseling, sir. He did receive that counseling at least 30 times as alleged in the complaint. Okay. So then he is released from suicide watch on the 19th by someone who is not a named defendant. Then two days later, that's when Beverly Woodbury sees him. And he refuses to be evaluated. Now, Beverly Woodbury sees him twice. November 21st, he refuses to be evaluated. Now, patients can certainly refuse to be evaluated. Okay. They can refuse medical treatment. Then she sees him six days later and she conducts a mental health evaluation and she notes that there are no mental health treatment concerns. So based upon her two interactions with him, okay, she could not draw the inference that he was a substantial risk of imminent suicide based upon those two interactions. And you've hit the nail on the head with regard to Maurer and Dominguez, given that they saw him in September and August, and he was at a different facility. They were at a different facility at Southern New Mexico Correctional Facility,  Here's the concern I have. Yes, I understand that when you put him on suicide watch, you are interfering with his, or hopefully, preventing him from carrying out the manifestation of his mental illness, which is to kill himself. But he's clearly suffering from a debilitating, profound mental illness, which isn't treated by putting him in suicide watch. And so I think the question that the plaintiffs are raising here is, isn't there some obligation, other than warehousing him, to make an effort to treat the clearly manifested mental health issue? Okay. Well, the only person that really would have seen that clearly manifested mental health issue would have been Tito Vidal, okay. So Tito Vidal did do the appropriate thing and placed him on therapeutic watch, right. And then the next day, Mr. Insinius tells him, I'm no longer wanting to commit suicide, okay. So you have to rely upon what your patient is telling you. And to do more than that means you're telling the mental health providers, you need to ignore what your patients are telling you, right. You need to not listen to them, and you need to force treatment on them. That's one of the hard issues in this case. Do you have to ignore that when I don't know what the record will show, but it wouldn't surprise me if the record doesn't show that people about to commit suicide will often deny it so that they won't be under that close supervision. Now, that may not be in the record at all. Right. It is not, and what is not in the record is that in those five days, Mr. Insinius sought mental health treatment from somebody and didn't receive it. That is not, there's no allegations in the record of that. So to imply that he's just languishing there and nobody's giving a darn about him, that's not in the record. There should be some allegations that say in those five days he's saying, help me, help me, help me, and no one is helping him. There is not that allegation there. There is not an allegation that Tito Vidal and Beverly Woodbury, who were the two people that saw him, that they did not provide the treatment that he asked for. Right. Beverly Woodbury wanted to treat him on November 21st. He refused treatment. She did observe him and treated him five days, six days later on November 27th, and she did not note any mental health concerns. Okay. So that's what we have in this case, and I think that what plaintiff is doing is plaintiff is disagreeing with the treatment decisions. Okay. Disagreeing with the decisions that these individual treatment providers made. Well, that may be medical malpractice. That is not a constitutional violation under MOTCA versus CISE or under CILOG. There is no clearly established law that says that an inmate is required to therapy as a way to prevent suicide. Okay. There is none, and the Supreme Court has recognized that in Taylor v. Barks. This court has recognized that in the Cox case. But I wish this court would establish those kinds of guidelines so that our treatment providers that are in our prisons would know exactly what they are doing so they have fair notice that what they are doing is the right thing or what they are not doing. You know, so they know. And we don't have that clearly established law in this circuit, which is why qualified immunity is appropriate here, because we don't have this clearly established law. And this court needs to recognize that just because an inmate has some mental health problems, okay, that doesn't mean that that inmate is suicidal. That doesn't mean that all people are suicidal if they have mental health problems. You know, it could very well mean that the mental health treatment that they are receiving is working, right? And just because an inmate is on suicide watch in one month but not the next month, that could very well mean that that therapy, that taking things away from them and putting them in a spot where they are constantly monitored, where they are constantly monitored, that that's actually working and then you're following up with that with more treatment. But again, if an inmate refuses the treatment, what are the mental health providers supposed to do? Are we supposed to force mental health treatment on the inmates? Then can you imagine the lawsuits we would face if we would be forcing mental health treatment on inmates who refuse to be evaluated or who no longer display suicidal thoughts and who actually tell you, I am not suicidal anymore. We can't force that on the inmates. Thank you. Thank you. Thank you, Your Honor. I would like to, you mentioned warehousing and that's exactly what they did. They put him in suicide watch, which is solitary confinement. They moved him from solitary confinement, moved him from suicide watch at the 72-hour mark, which would require a psychiatric evaluation. Ms. Woodbury found no concerns. She did not evaluate him. That's clear from the paperwork that she filed to properly fill out. She only put his name, birth date, and basic biographical information. The last five days of his life, he was not saying he wasn't suicidal. He was in segregation a minimum of 23 hours a day. No one checked on him for those last five days. The Department of Corrections references eminence. We couldn't find any reference of eminence in Tenth Circuit opinion. More than that, how do you know if he's eminently suicidal if you don't check on him when he remains Code 5 and he's placed in segregation by himself 23 hours a day? Sorry, I lost my screen. Supposedly on 11-17, he told the adult he wasn't suicidal, which is not surprising. He was in solitary confinement. He told Ms. Woodbury that he wasn't suicidal on the 27th. Again, not surprising because he was in solitary confinement. Solitary confinement is considered torture in many countries, and it's cruel and callous at a minimum. That is not treatment. Warehousing is not treatment. Diagnosis is not treatment. Diagnosis without corresponding care is not treatment. Classification as Code 5 is not treatment. What was meant by solitary confinement? I've visited prisons. Some solitary confinement is in isolated corridors that are blocked off from the rest of the world, and with solid walls, they can't communicate. Other times, solitary confinement simply means you're in a regular cell, but you're the only one in that cell. What was meant here by solitary confinement? He was in segregation 23 hours a day. Segregation in a regular cell, meaning simply he didn't have a roommate? Is that all it means? Well, I'm not sure. What does the record show so far? Well, we say it's solitary. We say he had no contact with anyone. He was non-constant watching. If you're in a cell and you don't have a cellmate, you wouldn't have contact. I guess we don't know what that means. Is that right? The record is not going to reveal to us what that means, whether you're kind of deprived of sensory input from anybody or whether you're in the main cell block, you just simply don't have a cellmate. We don't know which that is. Right. We don't know. That's something we can explore and discover. Okay. Go ahead. And you need to wind up. Pardon me? You're out of time, so you need to wind up. Do I have one minute left? No, you're in the red. Oh, okay. Sorry. Thank you. Thank you. We will take this matter under advisement.